STATE OF CONNECTICUT *v.* JOHN J. COMMINS
(AC 23953)

West, McLachlan and Hennessy, Js.

Argued March 25—officially released June 22, 2004

*Darcy McGraw*, special public defender, for the appellant (defendant).

*Sarah Hanna,* special deputy assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan,* state's attorney, and *Kelly Anne Masi,* assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, John J. Commins, appeals from the judgment of conviction, rendered after a jury trial, of operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a (a) (1). He claims that the trial court improperly (1) admitted into evidence testimony concerning a horizontal gaze nystagmus test, (2) permitted the introduction of two prior felony convictions to impeach a defense witness and (3) determined that two prior out-of-state convictions qualified the defendant as a third offender for purposes of § 14-227a (g). We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. Early in the morning of August 16, 2002, Officer Steven Santucci of the Newtown police department was on patrol on Route 34 in Newtown and observed the defendant, who was driving a truck, approach an intersection, enter a left turn only lane and activate the truck's left turn signal. Instead of turning left at the intersection, however, the defendant continued through the intersection, and drove along the median line and into the oncoming traffic lane. On the basis of those observations, Santucci initiated a traffic stop.

During the traffic stop, the defendant informed Santucci both that he was on his way home and that he was coming from his home. While speaking with the defendant, Santucci detected the odor of alcohol on his breath. In view of the defendant's erratic driving and

the odor of alcohol, Santucci proceeded to administer three field sobriety tests to the defendant.

The first test administered was the horizontal gaze nystagmus test. Nystagmus is the inability of the eyes to maintain visual fixation on a stimulus when the eyes are turned to the side, often resulting in a lateral jerking of the eyeball. See, e.g., *State* v. *Merritt*, 36 Conn. App. 76, 84, 647 A.2d 1021 (1994), appeal dismissed, 233 Conn. 302, 659 A.2d 706 (1995); see also annot., 60 A.L.R.4th 1129 (1988). The premise of the horizontal gaze nystagmus test is that as alcohol consumption increases, the closer to the midline of the nose the onset of nystagmus occurs. To administer the test, the officer positions a stimulus approximately twelve to eighteen inches away from and slightly above the subject's eyes. The stimulus, usually a pen or the officer's finger, is then moved slowly from the midline of the nose to maximum deviation, the farthest lateral point to which the eyes can move to either side. The officer observes the subject's eyes as he tracks the stimulus and looks for six clues, three for each eye, to determine whether the subject passes or fails the test. The officer looks for (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation and (3) the onset of nystagmus at an angle less than forty-five degrees in relation to the center point. A finding of four clues indicates failure of the test and is a sign of intoxication. Santucci testified that the defendant possessed all six clues and that those results indicated that the defendant was under the influence of alcohol.

Santucci also administered the walk and turn test and the one-leg stand test. Santucci testified that the defendant's performance on both tests indicated that he was under the influence of alcohol.[1]

---

[1] The defendant makes no claims on appeal with respect to those tests.

On the basis of the defendant's performance on the three tests, his erratic driving and the odor of alcohol on his breath, Santucci placed the defendant under arrest and transported him to the police station, where the defendant refused to submit to a breath test. The defendant subsequently was charged by information with driving while under the influence of intoxicating liquor in violation of § 14-227a (a) (1). The defendant also was charged in a part B information as a third offender in violation of § 14-227a (g) (3), on the basis of two previous convictions in New York for operating a motor vehicle while under the influence of intoxicating liquor.[2]

Prior to trial, the defendant filed a motion for a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to challenge the admission of evidence concerning the horizontal gaze nystagmus test. Specifically, the defendant challenged both the methodology underlying horizontal gaze nystagmus testing and Santucci's qualifications to testify as to his administration and grading of the test.

On November 7, 2002, the court conducted a *Porter* hearing at which the state called Constantine Forkiotis, a behavioral optometrist, as its sole witness.[3] Forkiotis testified that horizontal gaze nystagmus testing is generally accepted in the scientific community, has been comprehensively tested and subjected to peer review, can be explained to jurors in a manner that will assist them in executing their task and was not developed solely for the purpose of use in court. At the conclusion

---

[2] Although the court, in addressing the part B information, referred to General Statutes (Rev. to 2001) § 14-227a (h), that subsection was redesignated as subsection (g) by Public Acts, Spec. Sess., May, 2002, No. 02-01, § 108, prior to date of the defendant's arrest.

[3] We note that the defendant indicated that he had no objection to the court's recognition of Forkiotis as an expert in behavioral optometry.

of the hearing, the defendant asked that evidence of the test be excluded on the ground that it does not satisfy the standards enunciated in *Porter* for the admissibility of scientific evidence in that Forkiotis admitted that a group of ophthalmologists dispute the reliability of horizontal gaze nystagmus testing. The court rejected that argument and denied the defendant's motion in limine, concluding that horizontal gaze nystagmus testing satisfies *Porter* because it generally is accepted by the scientific community and meets the remaining *Porter* criteria.

After trial, the jury found the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor. The court, thereafter, heard argument on whether the defendant's previous convictions were substantially the same as a conviction under § 14-227a (a) (1) in order to qualify the defendant for third offender status under the part B information. The court ruled that the two prior convictions were substantially the same as a conviction under § 14-227a (a) (1), and the defendant indicated his intention to enter a nolo contendere plea to the charge of being a third offender. The court accepted the plea and sentenced the defendant to three years incarceration, execution suspended after one year, followed by three years probation. This appeal followed.

I

The defendant first claims that the court improperly denied his motion in limine to preclude evidence of the horizontal gaze nystagmus test. He argues specifically that the state (1) failed to establish a proper foundation for the admission of horizontal gaze nystagmus evidence as required by *State* v. *Porter*, supra, 241 Conn. 57, and (2) failed to establish an adequate foundation

for Santucci's testimony as to his administration and grading of the test.[4] We disagree.

"Our standard of review for evidentiary matters allows the trial court great leeway in deciding the admissibility of evidence. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Pjura,* 68 Conn. App. 119, 130–31, 789 A.2d 1124 (2002).

In determining whether the court properly admitted the horizontal gaze nystagmus evidence at issue, we employ the three part test set forth in *State* v. *Merritt,* supra, 36 Conn. App. 91.[5] That test requires that the state (1) satisfy the criteria for admission of scientific evidence,[6] (2) lay a proper foundation with regard to

---

[4] Although the defendant in his brief raised the additional claim that Forkiotis was not a qualified expert, we do not address the merits of that claim. As stated in footnote 3, the defendant stipulated at the *Porter* hearing that Forkiotis was an expert and, in so doing, waived that claim.

[5] We note that the present appeal is the first time our appellate courts have considered this precise issue. In both *State* v. *Russo,* 62 Conn. App. 129, 136 n.5, 773 A.2d 965 (2001), and *State* v. *Pjura,* supra, 68 Conn. App. 134, this court expressly declined to rule on the issue, despite the urging of counsel. We explained in *Pjura* that "[a]s we noted in *Russo,* we will not determine whether the [horizontal gaze nystagmus] test meets the [*Porter*] criteria when the trial court has not itself specifically ruled on that issue." *State* v. *Pjura,* supra, 134. In the present case, by contrast, the court made a specific determination that the horizontal gaze nystagmus evidence proffered by the state satisfied the *Porter* criteria for admission into evidence, therefore providing the necessary basis for our consideration of the issue.

[6] In conformity with the prevailing precedent at the time, we stated in *Merritt* that the party seeking to introduce horizontal gaze nystagmus testimony must, as a first step, satisfy the test set forth in *Frye* v. *United States,* 293 F. 1013 (D.C. Cir. 1923). We noted in *State* v. *Pjura,* supra, 68 Conn. App. 132–33, eight years after *Merritt,* that our Supreme Court's decision in *Porter* changed the applicable evidentiary test from *Frye* to the one more recently enunciated in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* 509

the qualifications of the individual administering the test and (3) demonstrate that the test was conducted in accordance with relevant procedures. See id.

A

The defendant argues that the evidence adduced at the hearing failed to establish an adequate foundation for the admission of scientific evidence as set forth in *Porter* and, therefore, fails to satisfy the first prong of *Merritt*.[7]

U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). We clarified that although *Porter* changed the criteria for admission, it did not affect the primary holding of *Merritt* that horizontal gaze nystagmus testing is the type of scientific evidence that requires a proper foundation. See *State* v. *Russo*, supra, 62 Conn. App. 135–36.

We note also that the *Merritt* test for the admission of horizontal gaze nystagmus evidence is substantially in accord with the approach of the majority of other jurisdictions that have addressed the issue. See, e.g., *Ballard* v. *State*, 955 P.2d 931 (Alaska App. 1998); *State* v. *Superior Court*, 149 Ariz. 269, 718 P.2d 171 (1986) (en banc); *Zimmerman* v. *State*, 693 A.2d 311 (Del. 1997); *Williams* v. *State*, 710 So. 2d 24 (Fla. App. 1998); *Hawkins* v. *State*, 223 Ga. App. 34, 476 S.E.2d 803, cert. denied, 223 Ga. App. 907 (Ga. 1996); *State* v. *Ito*, 90 Haw. 225, 978 P.2d 191 (App. 1999); *People* v. *Buening*, 229 Ill. App. 3d 538, 592 N.E.2d 1222, leave to appeal denied, 146 Ill. 2d 634, 602 N.E.2d 460 (1992); *State* v. *Murphy*, 451 N.W.2d 154 (Iowa 1990); *State* v. *Armstrong*, 561 So. 2d 883 (La. App. 1990); *State* v. *Taylor*, 694 A.2d 907 (Me. 1997); *Schultz* v. *State*, 106 Md. App. 145, 664 A.2d 60 (1995); *People* v. *Berger*, 217 Mich. App. 213, 551 N.W.2d 421 (1996); *State* v. *Hill*, 865 S.W.2d 702 (Mo. App. 1993), overruled on other grounds, *State* v. *Carson*, 941 S.W.2d 518 (Mo. 1997); *State* v. *Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000); *Ellis* v. *State*, 86 S.W.3d 759 (Tex. App. 2002); *State* v. *Zivcic*, 229 Wis. 2d 119, 598 N.W.2d 565 (1999), review denied, 239 Wis. 2d 308, 619 N.W.2d 91 (2000). Many of those courts have either taken judicial notice of the validity and reliability of horizontal gaze nystagmus testing or concluded that horizontal gaze nystagmus test results are admissible as scientific evidence as a matter of law and, therefore, those courts do not engage in a separate analysis of the first prong.

[7] Although not all scientific evidence must withstand scrutiny under *Porter* as a precondition to its admission into evidence; see *State* v. *Reid*, 254 Conn. 540, 549, 757 A.2d 482 (2000); this court has determined that evidence of horizontal gaze nystagmus testing is the type of scientific evidence to which the *Porter* test must be applied. See *State* v. *Pjura*, supra, 68 Conn. App. 133; *State* v. *Russo*, supra, 62 Conn. App. 136.

Under *Porter*, before proffered scientific evidence may be admitted, the court must determine that the evidence is scientifically valid and demonstrably relevant to the facts of the case, not simply valid in the abstract. *State* v. *Porter*, supra, 241 Conn. 65. In determining scientific validity, the *Porter* court noted that despite the rejection of the approach under *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), in which " 'general acceptance' " was the sine qua non of admissibility, courts should continue to consider general acceptance in making admissibility determinations. *State* v. *Porter*, supra, 84. As the court stated: "[W]e suspect that general acceptance in the relevant scientific community will continue to be the significant, and often the only, issue. . . . Thus, [a]lthough *Frye* may no longer be *the* standard for admissibility, general acceptance remains a part of the analysis, and in many cases its presence may alone be sufficient to admit the evidence. . . . [I]f a trial court determines that a scientific methodology *has* gained general acceptance, then the *Daubert* inquiry will generally end and the conclusions derived from that methodology will generally be admissible." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 84–85.

The *Porter* court then enumerated several other nonexclusive factors that may play a role in a trial court's assessment of the validity of a scientific methodology. Those factors include: (1) whether the methodology has been tested and subjected to peer review; (2) the known or potential rate of error; (3) the prestige and background of the expert witness supporting the evidence; (4) the extent to which the scientific technique in question relies on subjective interpretations and judgments by the testifying expert; and (5) whether the testifying expert can present the methodology underlying his scientific testimony in such a manner that the

fact finder can reasonably draw its own conclusions therefrom. Id., 86.

At the conclusion of the *Porter* hearing in the present case, the court found that the horizontal gaze nystagmus test and its underlying methodology is generally accepted in the scientific community. Although that finding alone likely would suffice to establish a sufficient foundation for admission; id., 84–85; the court also found that many of the remaining *Porter* criteria for admissibility were satisfied. Our review of the relevant transcript reveals that Forkiotis' testimony at the *Porter* hearing, as set forth previously, provided a factual basis for the court to find that (1) the methodology has been tested and subjected to peer review, (2) there is a known or potential rate of error, (3) Forkiotis was credible and (4) the methodology is explainable to the jury in a manner from which it reasonably could draw its own conclusions.

We accordingly conclude that the court properly determined that the horizontal gaze nystagmus evidence adduced at the hearing satisfied the *Porter* test for the admission of scientific evidence.

## B

The defendant next argues that the state failed to establish that Santucci was qualified to administer and to grade the horizontal gaze nystagmus test, as required by the second prong of *Merritt*.

The defendant conducted voir dire at trial as to Santucci's training and qualifications. Santucci testified that he had been a police officer for approximately two years and had spent six months at the police academy where he received training in the detection and apprehension of individuals operating motor vehicles while under the influence of liquor. He testified that he successfully completed an advanced detection class on the

subject, in which he was taught how to administer and to evaluate the horizontal gaze nystagmus test. In particular, Santucci offered detailed explanations of the theory underlying the test, the mechanics of administering the test and the method used to evaluate a subject's performance. Santucci also demonstrated the test in the courtroom on one of the state's attorneys.

As this appeal presents the first opportunity for a Connecticut court to consider whether a police officer was qualified to administer and to grade a horizontal gaze nystagmus test, we look for guidance to other jurisdictions that have considered the issue. In assessing whether a proper foundation has been laid respecting the qualifications of an officer to administer the test, courts have evaluated both the officer's training and experience. Although no mechanical factor test has emerged as dispositive, courts have considered a number of factors, including the length of time the individual has been a police officer, the approximate number of stops the officer has made in that time for operating a motor vehicle while under the influence of intoxicating liquor and any specialized training the officer has received relative to the horizontal gaze nystagmus test. See, e.g., *Tuttle* v. *State*, 232 Ga. App. 530, 502 S.E.2d 355 (1998); *People* v. *Buening*, 229 Ill. App. 3d 538, 592 N.E.2d 1222, leave to appeal denied, 146 Ill. 2d 634, 602 N.E.2d 460 (1992); *Cooper* v. *State*, 761 N.E.2d 900 (Ind. App. 2002); *Hulse* v. *State*, 289 Mont. 1, 34, 961 P.2d 75 (1998); *State* v. *Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000).[8] We find those factors helpful considerations in our analysis.

Applying those factors to the present case, we note that although Santucci's tenure as a police officer was

[8] Those courts accord varying levels of importance to those factors, some emphasizing experience and others the officer's specialized training. No single factor appears to be accorded greater weight than the others.

not particularly lengthy and that there was no testimony regarding the approximate number of drunken driving stops he had made during his tenure, he did receive specialized training in horizontal gaze nystagmus testing at the police academy. That training later was reinforced at advanced detection classes and tested through written examinations, which he successfully completed. Santucci also demonstrated his competence by testifying in detail as to how the test was administered, what clues he looked for in grading the test and how the defendant performed. On the basis of the foregoing, we conclude that Santucci's specialized training established that he was qualified to administer and evaluate horizontal gaze nystagmus tests.

C

We turn finally to the third prong of *Merritt* and the question of whether the horizontal gaze nystagmus test was performed properly and in accordance with prevailing standards.

We look again for guidance to other jurisdictions that have considered the issue. Those courts indicate that in determining whether a horizontal gaze nystagmus test has been administered properly, a primary consideration is whether a police officer has demonstrated an accurate understanding of the grading system. See, e.g., *Duffy* v. *Director of Revenue*, 966 S.W.2d 372, 378 (Mo. App. 1998); *State* v. *Hill*, 865 S.W.2d 702, 704 (Mo. App. 1993), overruled on other grounds, *State* v. *Carson*, 941 S.W.2d 518 (Mo. 1997). Courts also have examined whether the test was administered in accordance with the specialized training the officer received. See, e.g., *Bramble* v. *State*, 294 Mont. 501, 505, 982 P.2d 464 (1999). We consider those factors in our analysis.

At trial, Santucci both testified as to and demonstrated how he administered the horizontal gaze nystagmus test to the defendant. He explained to the jury the

six clues one looks for when grading the test and the number of clues that indicates failure of the test. Furthermore, the defendant neither alleged nor presented evidence indicating that Santucci had administered or graded the test in a manner inconsistent with his specialized training. On the basis of Santucci's uncontroverted testimony, we conclude that the horizontal gaze nystagmus test was performed properly and in accordance with his training.

In light of the foregoing determinations that under the circumstances of this case, (1) the horizontal gaze nystagmus test evidence satisfied the requirements of *Porter*, (2) Santucci was qualified to administer the test and (3) the test was performed properly, we conclude that the court properly admitted evidence of the horizontal gaze nystagmus test and properly denied the defendant's motion in limine.

## II

The defendant next claims that the court improperly permitted the introduction of two prior felony convictions to impeach a defense witness. Specifically, he argues that the court did not balance properly the probative value of admitting such evidence against its prejudicial effect and, instead, focused solely on the "ten year rule."[9] We disagree.

It is well established that a witness may be impeached by the introduction of his prior felony convictions. See, e.g., *State* v. *Dorans*, 261 Conn. 730, 754, 806 A.2d 1033 (2002); see also General Statutes § 52-145 (b); Conn.

[9] "While leaving the matter to the general discretion of the trial court, we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence. Rule 609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction substantially outweighs its prejudicial effect." *State* v. *Sauris*, 227 Conn. 389, 409–10, 631 A.2d 238 (1993).

Code Evid. § 6-7 (a). In recognition of the court's inherent authority to exclude evidence, the prejudicial tendency of which is deemed to outweigh its probative value, three factors have been identified to guide courts in considering whether a prior criminal conviction should be admitted to impeach a witness. Those factors are: "(1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time." (Internal quotation marks omitted.) *State v. Dorans*, supra, 755. "[W]e will not disturb the trial court's determination as to the admissibility of a prior conviction to impeach a witness absent an abuse of discretion . . . and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) Id., 756.

At trial, the defense called two witnesses, John Matey and Ken Durniak, who purportedly were with the defendant in the hours before his arrest. Matey testified that on the evening in question, the defendant and Durniak visited Matey's home to help him paint a bedroom. He testified that there was no alcohol in the house and that he did not observe the defendant consume any alcoholic beverages that night or appear intoxicated at any time. Matey stated that he heard a loud thump from the direction of the bedroom where the defendant was painting. When Matey went to investigate the sound, he observed the defendant on the floor in the bedroom, holding his head while Durniak helped him to stand. Matey testified that it was his belief that the defendant had fallen off a ladder while painting.[10] That testimony supported an alternate explanation for the defendant's performance on the three field sobriety tests.

During cross-examination of Matey, the state sought to introduce his two prior felony convictions for posses-

---

[10] Durniak's testimony essentially mirrored that of Matey.

sion of a shotgun silencer and for operating a motor vehicle while under the influence of intoxicating liquor from New York. Defense counsel objected to the introduction of the convictions on the ground that they were irrelevant to Matey's credibility. The court acknowledged that although the convictions did not relate to credibility, they were both less than ten years old and were felonies.[11] The court allowed their admission for impeachment purposes only and did not permit the state to name the specific felonies. The court further stated that it would instruct the jury that the prior felonies could be used only to assess Matey's credibility.[12]

Evidence of any felony conviction has been determined to bear on a witness' credibility irrespective of the precise nature of the crime and its direct relation to veracity. See General Statutes § 52-145; see also *State*

---

[11] After ascertaining that Matey had been convicted of the two felonies, the following colloquy, in relevant part, occurred:

"[Defense Counsel]: Yes, Judge. I'm objecting because I don't see how those two convictions would affect the witness' credibility on the [witness] stand. They're not fraudulent convictions; they have nothing to do with . . . character in terms of truth telling. And I think they aren't relevant to this proceeding and the facts of what happened that night.

"The Court: Well, the two convictions are less than ten years old. It's true what you say that the type of convictions don't have a direct bearing on credibility, but they are felonies. It was what, possession of?

"[The Prosecutor]: Shotgun silencer.

"The Court: Shotgun silencer and a felony [operating a motor vehicle while under the influence of alcohol or drugs]; they don't directly have a bearing on credibility, the types of charges. But felony convictions are—can be used for impeachment purposes. The defendant—pardon me, the witness is here testifying and subject to cross-examination.

"What I'm going to do is, I'm going to allow the state to ask the witness if he has two felony convictions, and he can answer the way he answered. I won't allow the state to name the charges. And I'll explain to the jury [that it] can use any convictions to assess his credibility, but that's it. Anything else?"

[12] The court instructed the jury immediately following Matey's testimony and again in its final charge that the two prior felony convictions were admitted for the limited purpose of assessing Matey's credibility.

v. *Rivera*, 221 Conn. 58, 74, 602 A.2d 571 (1992) (noting legislative judgment that records of all felonies affect credibility). Additionally, both of the convictions were less than ten years old and, therefore, within the time frame our Supreme Court has approved as a general guideline for determining remoteness. See *State* v. *Aponte*, 50 Conn. App. 114, 127, 718 A.2d 36 (1998), rev'd in part on other grounds, 249 Conn. 735, 738 A.2d 117 (1999).

Furthermore, any potential prejudice to the defendant in the present case was minimized by a number of factors. First, the convictions at issue pertained not to the defendant but to a defense witness. Our Supreme Court has stated that "[t]he danger of unfair prejudice is far greater when the accused, as opposed to other witnesses, testifies, because the jury may be prejudiced not merely on the question of credibility but also on the ultimate question of guilt or innocence." (Internal quotation marks omitted.) *State* v. *Askew*, 245 Conn. 351, 363, 716 A.2d 36 (1998). Second, defense counsel had the opportunity on redirect examination to explain the circumstances of the convictions and to eliminate any claimed prejudicial effect. See *State* v. *Jefferson*, 67 Conn. App. 249, 263, 786 A.2d 1189 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). Third, the court further reduced the risk of prejudice by expressly disallowing any reference to the felonies by name and by cautioning the jury, on two separate occasions, that the evidence of the prior convictions could be used only to assess the credibility of the witness. See *State* v. *Sauris*, supra, 227 Conn. 403 ("[j]urors are presumed to have followed the instructions of the court as to the law in the absence of a clear indication to the contrary").

In light of those considerations and the particular circumstances of this case, we conclude that the probative value of Matey's felony convictions outweighed any

potential prejudice their admission might have engendered. We accordingly conclude that the court's admission of those convictions was not an abuse of discretion.

III

The defendant last claims that his conviction on the part B information was improper because the New York statute, under which he was twice convicted of operating a motor vehicle while under the influence of alcohol or drugs, is not "substantially the same" as a conviction under § 14-227a (a) (1) and, therefore, forms an insufficient basis on which to adjudicate him a third offender under § 14-227a (g).[13] We decline to review the claim.

As stated previously, the state charged the defendant under a part B information as a third offender on the basis of his two prior convictions in New York, one in 1984 and the other in 1993, for operating a motor vehicle while under the influence of alcohol or drugs in violation of N.Y. Veh. & Traf. Law § 1192 (McKinney 1996). Following the jury's verdict finding the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor, the court addressed the part B information. After hearing argument on whether the New York convictions occurred within the ten year period set forth in § 14-227a (g) (3), the court concluded that the convictions qualified for consideration.[14] At that time, the defendant indicated his intention to enter a

---

[13] General Statutes § 14-227a (g) provides in relevant part that "a conviction in any other state of any offense the essential elements of which are determined by the court to be *substantially the same* as subdivision (1) or (2) of subsection (a) of this section . . . shall constitute a prior conviction for the same offense." (Emphasis added.)

[14] Although the defendant's 1984 conviction occurred more than seventeen years before the present conviction, it is well settled that only the most recent conviction must comply with the ten year rule. See, e.g., *State* v. *Kratzert*, 70 Conn. App. 565, 568–70, 799 A.2d 1096, cert. denied, 261 Conn. 932, 806 A.2d 1069 (2002).

plea of nolo contendere to the part B information. On the plea form, signed by the defendant on November 8, 2002, the defendant did not check the box indicating that the plea was conditional. Also, the court fully canvassed the defendant with regard to the plea and advised him of all relevant rights. The court found that the defendant had entered his plea knowingly, intelligently and voluntarily with the assistance of competent counsel, but the court did not accept the plea at that time.

On January 10, 2003, following a presentence investigation hearing at which the court again heard argument on the issue of whether the defendant's New York convictions qualified as "prior convictions" for purposes of § 14-227a (g), the court determined that the essential elements of the New York statute were substantially the same as § 14-227a (a) (1). The court then accepted the defendant's nolo contendere plea and sentenced the defendant as a third offender.

"It is well established that an unconditional nolo contendere plea, when intelligently and voluntarily made, operates as a waiver of all nonjurisdictional defects and bars later challenges to pretrial proceedings. . . . Thus, usually only those issues fully disclosed on the record which concern either the court's jurisdiction or the intelligent and voluntary nature of the plea are appealable after a nolo contendere plea has been entered and accepted." (Citations omitted; internal quotation marks omitted.) *State* v. *Gilnite*, 202 Conn. 369, 374–75, 521 A.2d 547 (1987).

Here, the defendant entered an unconditional nolo contendere plea to the part B information. He thereby waived his right to appeal on the ground of any nonjurisdictional claims arising from the part B information,

including the claim he asserts on appeal.[15] We therefore decline to review the merits of his claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[15] We recognize that in limited circumstances, this court has undertaken appellate review of cases involving the entry of nolo contendere pleas despite the absence of an affirmative showing on the record that the pleas were entered pursuant to General Statutes § 54-94a. In *State* v. *Van Der Werff*, 8 Conn. App. 330, 513 A.2d 154, cert. denied, 201 Conn. 808, 515 A.2d 380 (1986), we noted that although the defendant's written plea of nolo contendere did not indicate that it was made pursuant to § 54-94a, the parties treated the plea as conditional and the court would, accordingly, review it as such. See id., 331 n.1.

*Van Der Werff* is distinguishable from the present case because the record here does not support the conclusion that the defendant preserved his right to appellate review.