# STATE OF CONNECTICUT *v.* JOHN L.[1]
## (AC 23993)

Dranginis, Flynn and DiPentima, Js.

Argued May 27—officially released September 28, 2004

---

[1] In accordance with General Statutes § 54-86e, as amended by Public Acts 2003, No. 03-202, § 15, and this court's policy of protecting the privacy interests of victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained.

*Maria A. Cahill*, special public defender, with whom, on the brief, was *Carlos E. Candal*, special public defender, for the appellant (defendant).

*Frederick W. Fawcett*, supervisory assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

*Opinion*

DRANGINIS, J. The defendant, John L., appeals from the judgment of conviction, rendered after a jury trial, of two counts each of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1) and sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (4). On appeal, the defendant claims that (1) he was deprived of a fair trial because the prosecutor engaged in misconduct during rebuttal closing argument to the jury and (2) the trial court improperly admitted into evidence two letters that were retrieved from the defendant's computer. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In early June, 2001, the sixteen year old victim was alone with the defendant, her father, at their residence.[2] The victim's mother and brother had gone on an overnight trip with the Cub Scouts. Responding to the defendant's call, the victim went to the den, where the defendant was sitting at his computer desk. The defendant asked the victim to perform oral sex on him. Following the victim's shocked and unresponsive reaction, the defendant grabbed the victim's head and forced her to her knees. The defendant unzipped his pants,

---

[2] The other residents of the household included the victim's mother, younger brother, uncle and cousin.

put his penis in the victim's mouth, pushed her head back and forth with his hands and ejaculated in her mouth. The victim subsequently went to the bathroom, brushed her teeth and took a shower. She did not report the incident to anyone.[3]

Later that month, the victim, clad in her school uniform, was in her bedroom studying for her final exams when the defendant called her into his bedroom. The defendant grabbed the victim and threw her on the bed, which caused her to hit her head against the bedpost. The defendant held the victim down with one hand while he put on a condom. He pulled up her skirt, pushed her underwear aside and proceeded to have vaginal intercourse with the victim. The defendant did not again approach the victim sexually until December, 2001, when he offered to pay her $100 per month to perform oral sex on him or to have sexual intercourse with him. The victim refused.

Sometime thereafter, the victim told her uncle about the sexual encounters with the defendant. The victim assured her uncle that she would tell her mother and stated that, in the interim, he should not tell anyone. On December 23, 2001, the victim was staying at a friend's house when her mother came to take her home. The victim refused, and a scuffle ensued between the mother and the friend. The police were called to the scene. A police officer spoke to the victim, who told him that she did not want to return home because the defendant had sexually assaulted her more than once. The police officer, in the presence of the victim's mother, obtained a statement from the victim about the

___

[3] At trial, the victim testified that she did not tell her mother about the incident because they did not have a close relationship. She admitted that she was very close to the defendant and had confided in him that she was sexually active with her boyfriend. She further testified that she did not report the incident to the police because the defendant had told her that if she told anyone, he would come after her when he got out of jail.

sexual encounters with the defendant. Following his arrest and subsequent trial, the defendant was sentenced to thirty years imprisonment, execution suspended after twenty years, with fifteen years of probation. This appeal followed.

## I

The defendant first claims that he was deprived of a fair trial because the prosecutor engaged in misconduct during rebuttal closing argument to the jury.[4] Specifically, the defendant argues that the prosecutor attempted to allocate the burden of proof to the defendant by asserting to the jurors that to acquit the defen-

---

[4] The defendant asserts that the prosecutor made the following improper remarks to the jury: "One reason I'm going to take about half as long as [defense counsel] is because I'm only going to talk about the evidence, and [defense counsel] spoke about thirty minutes about the evidence and about thirty minutes about his speculation about facts that are simply not in the evidence in this case. Now, to accept [defense counsel's] speculations, you have to accept the fact that there lies here a conspiracy within the [victim's] family. It's not a broad based conspiracy as Watergate [was] or something like that. But, nevertheless, to accept [defense counsel's] speculation, you have to accept the fact that there is a conspiracy comprised of certainly [the victim], her mother . . . and her uncle . . . and even her girlfriend . . . all to frame [the defendant].

\* \* \*

"Is that a fabrication by [the victim's mother]? Is she part of this conspiracy wheel?

\* \* \*

"The defense would have you conclude that [the victim's mother] is some kind of scheming twenty-first century Mata Hari.

\* \* \*

"And, of course none of this conspiracy theory works at all unless you also pull [the uncle] into it and now, having heard counsel a little while ago, the defendant's brother-in-law . . . as well. . . . The conspiracy is getting bigger and bigger and bigger. Of course, before we can begin to accept any suggestion that there is a conspiracy, we have to accept that [the victim] was mad at daddy because he wasn't letting her run wild. . . . Did [the victim's mother] join this conspiracy with her daughter because dad wasn't letting her daughter run wild?

\* \* \*

"[The victim's mother], you've got to enlist her in this conspiracy. It just doesn't make sense."

dant, they not only would have to find that the state's witnesses had lied, but also that those witnesses had conspired to do so. The state argues that the prosecutor's rebuttal argument properly addressed the claims made during the defendant's closing argument to the jury. We agree with the state.

As a preliminary matter, the defendant concedes that he did not preserve his claim at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine.[5] See Practice Book § 60-5. Our Supreme Court recently determined that in cases involving incidents of prosecutorial misconduct, "the *Golding* test is superfluous . . . because the due process analysis employed in prosecutorial misconduct cases, pursuant to *State* v. *Williams*, 204 Conn. 523, 539–40, 529 A.2d 653 (1987), embodies the third and fourth prongs of *Golding*, i.e., whether a constitutional violation occurred and whether it was harmful. *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004). Therefore, we will not apply the *Golding* test to the defendant's claims of prosecutorial misconduct, as our due process analysis will adequately address whether any unpreserved claims are of constitutional magnitude requiring a new trial."[6] *State* v. *Santiago*, 269 Conn. 726, 732–33, 850 A.2d 199 (2004).

Before addressing the merits of the defendant's claims, we set forth the general principles that guide our analysis of those claims. "To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was

---

[5] See *State* v. *Golding*, supra, 213 Conn. 239–40 (setting forth four-pronged test defendant must meet to prevail on claim of constitutional error not preserved at trial).

[6] Because we employ the standards set forth in *State* v. *Williams*, supra, 204 Conn. 539–40, to review the defendant's claims, we will not address those claims under the plain error doctrine.

fundamentally unfair and that the misconduct so infected the trial with unfairness as to make the conviction a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 699–700, 793 A.2d 226 (2002).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court . . . has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

The defendant asserts that the prosecutor's use of the word "conspiracy" to summarize the events involving the defendant tainted the jurors by appealing to their emotions, passions and prejudices and so infected the proceedings as to deprive the defendant of his right to a fair trial. The defendant's arguments are misplaced.

"When making closing arguments to the jury . . . [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument." (Citation omitted; internal quotation marks omitted.) *State* v.

*Reynolds*, 264 Conn. 1, 162, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

The prosecutor's comments did not exceed the bounds of proper oral advocacy. The prosecutor used the word "conspiracy" to rebut the defendant's negative portrayal of the victim and the events leading to her disclosure of the defendant's sexual assault.[7] The word "conspiracy" neither inflamed the jurors nor tugged at their heartstrings to arouse their passions and deprive the defendant of a fair trial. Moreover, the defendant did not object to the prosecutor's remarks or request a curative instruction prior to the court's charge to the jury. We note that the defendant bears much of the responsibility for the fact that the allegedly improper remarks went uncured because the defendant failed to bring the alleged misconduct to the attention of the trial court.

"We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of

[7] During closing arguments, the defendant argued: "We all know when kids get liberated that way [referring to the victim's purchasing a car after receiving her driver's license], marks go down, friends from distant places pop up. It's trouble. . . . Academically, she falls apart. [The victim] talks about—I don't know—drinking, smoking. . . . [E]verything goes wrong."

The defendant further argued: "Now, [the victim is] an official victim. She goes from having the whole world pissed off at her for screwing up in school, for wrecking her own car, for doing everything wrong, for staying out late and not coming home, out late to what, she's a victim. Daddy is out of the picture. Who's living in the house? [The uncle], the guy who lends you the money for the car, the guy you tell everything first to like he's your best girlfriend or something else. Your mom, you are all in the same house, but daddy is out of the picture."

the case at the time. . . . Moreover . . . defense counsel may elect not to object to arguments that he or she deems marginally objectionable for tactical reasons, namely, because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument." ( Internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 483–84, 832 A.2d 626 (2003). Accordingly, we conclude that the prosecutor did not engage in misconduct during his rebuttal closing argument to deprive the defendant of the right to a fair trial.

## II

The defendant next claims that the court improperly admitted into evidence two letters that were retrieved from his computer. Specifically, he argues that the prosecutor failed to lay a proper foundation as to the letters' authenticity to warrant their admission into evidence. The defendant further argues that the letters were inadmissible hearsay and did not fall within any of the exceptions to the hearsay rule. The defendant contends that the admission of the letters was extremely prejudicial and harmful to his case. We disagree.

The following additional facts are relevant to the defendant's claim. At trial, the victim's mother testified that on December 23, 2001, after learning about the sexual assault by the defendant, she immediately packed some clothes and left the family home with her son. On the advice of the local police investigating the allegations, she did not return to the home that day. On Christmas Eve, she needed additional items from the house and telephoned the house to determine if the defendant was at home. The defendant answered the telephone and apologized for his behavior, claiming that he was sick and needed help. The victim's mother and the uncle went to the house that night, but the defendant was not at home. The victim's mother further testified

that after obtaining a restraining order, she returned to the home on December 26, 2001, to remove the defendant's possessions. She searched the entire house, including the wastebaskets while she was throwing his possessions in the garbage. She then went to the defendant's computer because he always used it. At that point, she discovered the two letters on the computer, which she printed and gave to the department of children and families.[8]

Other testimony revealed that the victim and her uncle had their own computers and that each person in the home used his or her computer exclusively. The victim testified that she would use the defendant's computer only if her printer was not working.

Jeffery McGrurk, laboratory assistant at the state police computer crime unit (crime unit), examined the defendant's computer, removed the hard drive and cop-

---

[8] The first letter was addressed to the defendant's son. It stated: "Dear [son], I am sorry that your Christmas was ruined by me. Daddy did some bad things that he never meant to do. He has some problems that he never took care of back when he was little and they just caught up with him. I want you to know that I will always love you and hope that you grow up to be a better man than I was. Love always, dad."

The second letter was addressed to the defendant's wife. It stated in relevant part: "I know that this will not help to ease the pain that I have caused to you and the rest of the family. But I want you to know that I never meant to do anything that would hurt you or the kids. I just wanted to be a good father and husband, but I screwed up like I always do. You were right that I never admitted to myself that the things that happened to me when I was a kid would make me do the same things when I grew up. There is my last paycheck and all the cash that I had on me [is] on the table in the kitchen. I have two more checks coming this month that should cover the bills for January. There is about 25,000 in my 401 (k) that you will get. Please just cremate me and use the rest for [our son] and [the victim]. I know that there will be hard times ahead of you and the kids, but without me around the three of you should make it just fine. I almost forgot, there is 2200.00 in my credit union account . . . that should help some also. Please make sure that [relatives] get their xmass gifts because we did not get a chance to see them this year. Again, I am sorry for what happened. Love John."

ied the data to a sterile hard drive. He also examined the floppy disks that were seized and copied them. Steven DePietro, another laboratory assistant with the crime unit, testified that the two letters were created on December 24, 2001. The letter addressed to the defendant's son was created on a floppy disk at 11:46 a.m. and copied to the hard drive at 12:41 p.m., while the other letter was created on a floppy disk at 12:01 p.m. and copied to the hard drive at 12:47 p.m. DePietro also testified that he did not know who had access to the defendant's computer and that the date could be changed. The prosecutor introduced records of the defendant's telephone bill showing calls that were placed to the defendant's brother in Vermont on December 24, 2001, at 12:17 p.m., 12:49 p.m., 2:30 p.m., 3:33 p.m. and 4:49 p.m. to show that the defendant was at home at the time the letters were created.

The defendant objected when the letters were being read into evidence on the ground that the state had not laid a proper foundation for their admissibility. The defendant argued that any one of the family members had access to the defendant's computer and could have created the letters. The defendant further argued that the date on the letters could have been altered. The state did not disagree with the defendant's argument. Instead, it argued that there was testimony from other family members that they were not the authors of the letters, that telephone calls were made to the defendant's brother during the time the letters were created, that the defendant went to Vermont and that the contents of the letters mirrored the defendant's telephone conversation with the victim's mother. The court admitted the letters into evidence.

"Our standard of review for evidentiary matters allows the trial court great leeway in deciding the admissibility of evidence. The trial court has wide discretion in its rulings on evidence and its rulings will be reversed

only if the court has abused its discretion or an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Commins*, 83 Conn. App. 496, 502, 850 A.2d 1074 (2004).

The defendant contends that the letters were inadmissible evidence because they were not handwritten or signed and therefore could not be authenticated as to his handwriting. The state counters that the direct and circumstantial evidence presented at trial laid the proper foundation for admitting the letters into evidence.

Connecticut Code of Evidence § 9-1 (a) provides that the authentication requirement "is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Section 9-1 (a) requires only a prima facie showing of genuineness and leaves it to the fact finder to decide the true authenticity and probative value of the evidence. See *State* v. *Valentine*, 255 Conn. 61, 77, 762 A.2d 1278 (2000); see also Conn. Code Evid. § 9-1 (a), commentary. Connecticut Code of Evidence § 9-1 (a) does not specify how a piece of evidence may be authenticated. "In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence." *State* v. *Berger*, 249 Conn. 218, 233, 733 A.2d 156 (1999). Federal authorities support that rule. "[T]he government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery." (Internal quotation marks omitted.) *United States* v. *Trujillo*, 146 F.3d 838, 844 (11th Cir. 1998); see Conn. Code Evid. § 9-1 (a), commentary; see also *State* v. *Valentine*, supra, 77 ("[t]elephone conversations may be authenticated by circumstantial evidence, if the party calling, in addition to stating his identity, relates facts and circumstances

that, taken with other established facts, tend to reveal his identity" [internal quotation marks omitted]).

The letters were authenticated properly, as provided under the commentary to § 9-1 of the Connecticut Code of Evidence. The state provided sufficient circumstantial evidence to link the defendant's presence at his home with the time the letters were created. The letters referred to the defendant's finances, including payroll expectations, the existence of a 401 (k) account and a credit union balance. Furthermore, the letters gave instructions to cremate the defendant's body and apologized for any pain that the defendant may have caused the family. "Conclusive proof of authenticity is not required. . . . The government can also rely on the contents of the letter to establish the identity of the declarant." (Citation omitted; internal quotation marks omitted.) *United States* v. *Scurlock*, 52 F.3d 531, 538 (5th Cir. 1995); see also *United States* v. *Natale*, 526 F.2d 1160, 1173 (2d Cir. 1975) (holding that for authentication, "[p]roof of the connection of an exhibit to the defendants may be made by circumstantial, as well as direct evidence") cert. denied, 425 U.S. 950, 96 S. Ct. 1724, 48 L. Ed. 2d 193 (1976). Furthermore, the jury was free to decide what weight it would give to the evidence. See *State* v. *Wortham*, 80 Conn. App. 635, 642, 836 A.2d 1231 (2003) ("[i]t is the jury's right to accept some, none or all of the evidence presented"), cert. denied, 268 Conn. 901, 845 A.2d 406 (2004). Under those circumstances, we conclude that the court did not abuse its discretion in admitting the letters into evidence.

The defendant also argues that the letters were inadmissible hearsay. The defendant asserts that the letters were not an admission and did not fall within any of the hearsay exceptions. Because we have concluded that the state produced sufficient evidence from which the jury could have reasonably inferred that the defen-

dant was the author of the letters, the court properly found that the hearsay statements contained in the letters were statements made by a party opponent. See Conn. Code Evid. § 8-3 (1) (A); see also *State* v. *Markeveys*, 56 Conn. App. 716, 719, 745 A.2d 212 (words of party opponent generally admissible against him or her), cert. denied, 252 Conn. 953, 749 A.2d 1203 (2000).

Moreover, the letters expressed the defendant's then existing mental or emotional condition at the time of authorship. See Conn. Code Evid. § 8-3 (4). In the letter to his son, the defendant expressed regret, mentioned problems from his childhood and his hope that his son would be a "better man" than he was. In the letter to his wife, the defendant acknowledged that they had discussed "things that happened to [him] when [he] was a kid would make [him] do the same things when [he] grew up." The contents of the letter also acknowledged the pain he had caused the family and expressed the defendant's desire that his body be cremated. The defendant opined that "without [him] around the three of [them] should make it just fine." He further expressed remorse to his son and wife.

On the basis of our review of the record, we conclude that the letters were not inadmissible hearsay and that the court did not abuse its discretion in admitting them. Accordingly, the defendant's claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.